**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:18-cv-175-MOC-WCM**

| | |
|---|---|
| RONALD WAYNE SPANN, | ) |
| | ) |
| Plaintiff, pro se, | ) |
| | ) |
| vs. | ) |
| | ) |
| FRANK PERRY, et al., | )  <u>ORDER</u> |
| | ) |
| Defendants. | ) |
| _____ | ) |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by

Defendants Christopher Crawford, Dexter Gibbs, Jaime M. Grindstaff, Norma Melton, Frank L.

Perry, Michael Slagle, Paula Smith, and George Solomon, ("the Department Defendants"). (Doc.

No. 69). Also pending is a separate summary judgment motion, filed by Dr. Robert Uhren (Doc.

No. 56). For the following reasons, summary judgment is granted to all Defendants, and this

matter is dismissed with prejudice.

I.      BACKGROUND

A.      <u>Procedural Background</u>

On June 21, 2018, while incarcerated in the custody of the North Carolina Department of

Public Safety ("NCDPS"), and pursuant to 42 U.S.C. § 1983, Plaintiff Ronald Spann filed this

action against Defendants, alleging that Defendants acted with deliberate indifference to his

serious medical needs in violation of the Eighth Amendment while he was incarcerated at

Mountain View Correctional Institution. On November 12, 2020, Defendant Dr. Uhren filed a

Motion for Summary Judgment. (Doc. No. 56). On November 13, 2020, this Court entered an

order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court.  (Doc. No. 60).

On December 21, 2020, the Department Defendants filed their own summary judgment motion.  (Doc. No. 69).  On December 28, 2020, this Court again entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975).  (Doc. No. 72).  Plaintiff has not responded in opposition to the motions for summary judgment, except for filing letters in the Court, in which he asks for assistance in responding to the summary judgment motions, and in which he asserts that he would like to settle the case.  (Doc. Nos. 65, 78).  He has attached no admissible evidence, however, in the form of affidavits or exhibits, to rebut any of Defendants' summary judgment evidence.

**B.**     **<u>Factual Background</u>**

**1.**     **Plaintiff's Allegations and Summary Judgment Materials**

**a.**     **Plaintiff's Allegations Relative to the Department Defendants**

Plaintiff makes broad and general allegations that he received inadequate or delayed medical care while housed at Mountain View.  Specifically, Plaintiff also asserts that Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford failed to properly train "prison employee" to respond to inmates' medical needs.  (Doc. No. 1, ¶ 200).  He also contends that Defendants Melton and Grindstaff were personally involved in "acts or omissions that caused" his injuries. (<u>Id.</u> at ¶ 203).

Plaintiff alleges that before his incarceration the Social Security Administration declared him totally disabled, based on osteoarthritis and other disorders.  (<u>Id.</u> at ¶ 14).  Plaintiff also alleges severe nerve damage that causes him chronic pain, which he manages with daily pain

2

medication. (Id. at ¶ 15). He also claims paralysis on the right side of his lower back and partial right leg paralysis. (Id. at ¶ 16). Plaintiff claims that "[d]ue in part to the negligence of the Defendants, as described herein, the Plaintiff has been confined to a wheelchair since February 2015." (Id. at ¶ 17).

Plaintiff alleges that upon his arrival at Mountain View Correctional Institution on July 10, 2011, staff medically evaluated him. (Id. at ¶¶ 20, 22). During the evaluation, Dr. Uhren advised Plaintiff that the Social Security Administration's disability determination had no impact over his evaluation/ treatment. (Id. at ¶ 23). Although Plaintiff had previously been prescribed both Percocet and Flexiril for many years before arriving at Mountain View, Dr. Uhren placed Plaintiff on Tylenol or Ibuprofen to manage pain. (Id. at ¶ 24).

Plaintiff alleges that x-rays of Plaintiff's back were taken in 2012 and, after reading those x-rays, Dr. Uhren informed Plaintiff he did not have severe back problems and did not need back surgery. (Id. at ¶¶ 25–26). Plaintiff next alleges that he filed a grievance "concern[ing] medical issues" in January 2014, complaining of the number of requests he had to make before he could see Defendant Uhren. (Id. at ¶¶ 27, 28). Following three separate sick call requests, Plaintiff was finally seen by Dr. Uhren, was prescribed Tylenol and Ibuprofen, and was informed that if he was not better in four weeks his prescription for Neurontin would be increased. Plaintiff alleges, however, that Dr. Uhren allowed the prescription to expire. (Id.). Plaintiff alleges that he saw nurses, rather than a physician, even though he requested to see a physician in his sick call requests. (Id. at ¶ 29).

Plaintiff alleges that in April 2014, he submitted another grievance "concerning continued negligence of medical staff and administration of Mountain View" and "improper investigation" of matters raised in his sick call requests. (Id. at ¶ 37). Plaintiff alleges that the

Department violated his Eighth Amendment rights by deducting funds from his trust account for sick call appointments and care that he contends were "inadequate." (Id. at ¶ 45).

Plaintiff alleges that in February 2015, he was experiencing and complained of excruciating pain. (Id. at ¶¶ 61–64). He contends that he was seen by "medical staff" on February 10 and 12, 2015. (Id. at ¶ 65). Plaintiff also alleges that in February 2015, he was sent to an outside hospital for hernia surgery and that, because of the delay in sending him, the hernia had migrated to other parts of his body, requiring the insertion of wire mesh in his groin, which still gives him problems. (Id. at ¶¶ 50–51). Plaintiff alleges that four years after his initial complaints of back pain to Mountain View medical staff, he was sent to an outside specialist. (Id. at ¶¶ 53–54).

In June 2015, Plaintiff saw an orthopedic surgeon for back pain, four years after his initial notice to staff at Mountain View of his back pain and three years after Dr. Uhren had informed Plaintiff that he did not have severe back problems and did not need back surgery. (Id. at ¶¶ 53–55). Plaintiff alleges that on July 2, 2015, he was seen by Defendant Grindstaff and another nurse and was told that a physician's assistant would see him the following week. (Id. at ¶ 68). Plaintiff alleges that in July 2015 he continued to have excruciating pain and was finally "given an appointment for July 22, 2015." (Id. at ¶ 71). He claims that when he arrived for the appointment, correctional staff informed him that Defendant Grindstaff rescheduled his appointment. (Id. at ¶ 72). Plaintiff alleges that his complaints of pain were ignored for eight weeks. (Id. at ¶ 76).

Plaintiff alleges that in October 2015, he filed another grievance, in which he complained of having problems with the "Medical Department at Mountain View[,]" including not receiving his medications as scheduled. (Id. at ¶ 83). Plaintiff alleges issues related to not seeing

4

particular medical professionals in certain time frames. (Id. at ¶¶ 85–86). Plaintiff alleges that he wrote to the "Western Regional Director of Prisons concerning the medical treatment he was receiving and not receiving at Mountain View." (Id. at ¶ 87). In November 2015, Plaintiff was sent to Valdese Hospital for extensive MRIs, which revealed a large cyst attached to his spinal cord, as well as severe sciatic nerve damage and the enlargement of certain spinal discs. (Id. at ¶ 57).

Plaintiff alleges that he was transferred to Franklin Correctional in February 2016, and that his medication was not sent with him because "these medications were deliberately withheld by medical staff and or stolen by staff at Mountain View." (Id. at ¶¶ 91, 94–95). He alleges that during this time period he went about ten days without his wheelchair or his medication. (Id. at ¶¶ 99–102). Plaintiff claims this was all "deliberately and intentionally done in order to case [him] immense pain and suffering." (Id. ¶ 102). Plaintiff alleges that Defendant Melton's response to his grievance about the medication issue with this trip to Franklin "defied logic[.]" (Id. at ¶¶ 104–06). Plaintiff alleges that on February 9, 2016, he was taken to Duke and advised by a surgeon that he would need immediate surgery to remove a large cyst on his spine, and a nerve test was ordered due to numbness in Plaintiff's legs. (Id. at ¶ 97). On March 14, 2016, Plaintiff collapsed in his cell and the next day declared a "medical emergency," but he was not permitted to see anyone "in medical." (Id. at ¶¶ 110–11). Plaintiff alleges that in April 2016 he filed a grievance complaining of the response from medical staff after he reported falling. (Id. ¶ 112). Plaintiff further alleges additional grievances concerning his pain and the medical care he received at Mountain View. (Id. ¶¶ 114–17).

On June 17, 2016, Plaintiff was transported to Duke Medical Center to see a surgeon. During the transport, his ankles were chained and he was shackled with a bar on his wrists and

5

also strapped to the wheel of his wheelchair.  He was not allowed food, water, or restroom breaks during the transport, and by the time he saw the doctor, had gone over 7 1/2 hours with no food or water.  On the return trip, he was similarly denied food, water, and restroom breaks.  (Id. at ¶¶ 117–22).  Plaintiff was returned to Duke Hospital on June 29, 2016, for back surgery.  He alleges that, due to Defendants' negligence, the cyst on his spine had grown to such an extent that the procedure took 8 hours instead of the anticipated 4.5 hours.  Plaintiff spent five days in the intensive care unit after his surgery.  (Id. at ¶¶ 124–26).  Plaintiff also alleges that he put in a sick call and waited for five weeks.  (Id. at ¶ 129).

Plaintiff alleges that in July of 2016, he was informed that his pain medication had run out.  (Id. at ¶¶ 141–42).  He alleges this was retaliatory.  (Id. at ¶ 142).  He alleges that in January 2017, Defendant Melton did not send his medical boots to him.  (Id. at ¶ 148).  Plaintiff alleges that he fell in October 2016 while trying to maneuver a large wheelchair.  (Id. at ¶ 150).  He claims that he asked Defendant Melton for a smaller wheelchair and that she advised him that none were available.  (Id. at ¶ 151).  He also alleges that he fell again in November and that Defendant Melton was again informed that he needed a smaller wheelchair.  (Id. at ¶¶ 152–53).  Plaintiff alleges that Defendant Melton refused to provide him with a smaller wheelchair, despite them being available.  (Id. at ¶ 154).

Plaintiff alleges that on November 30, 2016, he was seen by Defendant Grindstaff for his complaints about the pain in his back and legs.  (Id. at ¶ 155).  Plaintiff alleges that Defendant Grindstaff did not take his blood pressure.  (Id.).  Plaintiff makes additional allegations about delays in seeing particular medical professionals.  (Id. at ¶¶ 156–59).  Plaintiff alleges that none of the defendants has "ever adequately addressed Mr. Spann's medical needs [...] and that each have been deliberately indifferent his medical needs."  (Id. at ¶ 175).  Plaintiff alleges that

Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford "failed to properly train the prison employees in responding to and meeting the necessary healthcare needs of its inmates." (Id. at ¶ 200). Plaintiff alleges that Defendants Uhren, Melton, and Grindstaff were personally involved in the acts and omission that caused Plaintiff's injuries[.]"  (Id. at ¶ 203).

### 2. Defendants' Summary Judgment Materials

### a. The Department Defendants' Summary Judgment Evidence

### i. Custody and Executive Defendants

The Department Defendants' summary judgment evidence includes Defendants' Responses to Plaintiff's Interrogatories, as well as the sworn affidavits of Defendants Melton and Grindstaff. Defendant Crawford, at all relevant times, was the Associate Warden for Custody at Mountain View. Defendant Gibbs, at all relevant times, was the Associate Warden for Programs at Mountain View. Defendant Perry, at all relevant times, was the Secretary of the North Carolina Department of Public Safety. Defendant Smith, at all relevant times, was the Chief of Health Services for the Department. Defendant Solomon, at all relevant times, was the Director of Prisons. (Dep't Defs. Ex. 1 at 2–4).

As the Associate Warden for Custody, Defendant Crawford was responsible for the management, supervision, and administration of custody and security operations. As the Associate Warden of Programs, Defendant Gibbs is the administrative supervisor for three departments, Programs, Medical, and Mental Health. As the Secretary of the Department, Defendant Perry oversaw the operations of the entire state agency. As the Warden, Defendant Slagle oversees all operations of Mountain View. As the Medical Director of the Department, Defendant Smith oversaw the administration of health services throughout all prison facilities. As the Director of Prisons, Defendant Solomon was responsible for overseeing operation of adult

7

prisons throughout the state. (Id. at 4–5).

Given the roles of these Defendants (Perry, Secretary of the Department, Smith, Medical Director, and Solomon, Director of Prisons), none of them had any personal knowledge of Plaintiff's specific subjective experience. (Id. at 8). Given the roles of Defendants Perry, Smith, and Solomon, none of them had direct involvement in the provision of medical care to Plaintiff. (Id.). Defendants Perry and Solomon were not involved in the Utilization Review ("UR") process, which is the process used by the NCDPS for assessing and treating prisoners' medical conditions. (Id. at 9). Defendant Smith, for her part, has no recollection of being involved in any UR process relative to Plaintiff's medical care from July 2011 to present. (Id.). Defendants Crawford, Gibbs, and Slagle were not personally involved in any particular transfers or medical visits of Plaintiff's. (Id. at 11). Moreover, Defendants Crawford, Gibbs, and Slagle had no direct role in the provision of medical care to patients, including Plaintiff. Instead, Defendants Crawford, Gibbs, and Slagle served as administrators with oversight responsibility for operations within the facility. (Id.). Defendants Crawford and Slagle did not participate in any investigations related to Plaintiff's medical concerns because doing so was not a typical function of their positions. (Id. at 13). Defendant Gibbs provided responses to Plaintiff's grievances, some of which related to medical issues; however, he lacks any personal knowledge of many of the issues raised in Plaintiff's complaint. (Id.).

ii. **Nursing Defendants Melton's and Grindstaff's Summary Judgment Evidence**

Here, the nursing Defendants Melton and Grindstaff, unlike the supervisory Defendants, did have some direct contact in the care of Plaintiff. These Defendants have both submitted affidavits generally describing their care of Plaintiff at Mountain View and also responding

8

specifically to Plaintiff's allegations of deliberate indifference. Defendant Melton was the Nurse Supervisor at Mountain View at all relevant times. Defendant Grindstaff was a float nurse in the western region of North Carolina at all relevant times. (Ex. 1 at 2-4). As a nurse, Defendant Grindstaff's duties and responsibilities include, medication administration, lab draws, seeing patients for sick call, self-declared emergencies, and other patient encounters. She also ensures that provider orders are carried through. Defendant Grindstaff may also be asked to triage and schedule sick calls and see patients who were transferring in/out of facility. As a Nursing Supervisor, Defendant Melton supervises the nursing and administrative staff assigned to the medical department to ensure that the providers order are followed and to provide access to quality healthcare for all of the offenders. (Id. at 4–5). Defendant Melton does not recall personally being involved in Plaintiff's medical care. (Id. at 18; Melton Aff. at ¶ 17). Moreover, as the Nurse Supervisor at Mountain View Correctional Institution, Defendant Melton has knowledge of and is familiar with the types of staff that are involved in providing patient care to all inmates. (Melton Aff. at ¶ 5). Facility administrators, assistant facility administrators, program directors, case managers, or various other correctional staff, including officers, sergeants, lieutenants, etc., are not involved in providing patient care to inmates at Mountain View. (Id. at ¶ 6). Additionally, other employees and executive management of the Department, such as the Director of Health Services for the Division of Prisons, the Nurse Supervisor for the Western Region for the Division of Prisons of the Department, the Commissioner of Adult Correction and Juvenile Justice, or the Secretary of the Department, are also not involved in providing patient care to inmates at Mountain View. (Id. at ¶ 7).

Defendant Grindstaff recalls seeing Plaintiff several times following sick call requests. (Ex. 1 at 15; Grindstaff Aff. at ¶¶ 6–11). Defendant Grindstaff would have become aware of

9

Plaintiff's reported subjective pain experience during each clinical encounter, in which she took part. (Ex. 1 at 17; Grindstaff Aff. at ¶ 14). Based on Plaintiff's presentation, Defendant Grindstaff would have treated Plaintiff in accordance with established nursing protocols or scheduled him to be evaluated by a provider. (Ex. 1 at 17–18; Grindstaff Aff. at ¶¶ 10–11, 14).

On January 2, 2016, Plaintiff did not show up for his appointment. (Grindstaff Aff. at ¶ 6). On March 15, 2016, Plaintiff was seen for a sick call, at which time Defendant Grindstaff prescribed five days of Ibuprofen per protocol. Ibuprofen and Acetaminophen are the first line protocol medications that nurses are permitted to administer before the patient is seen by a physician, nurse practitioner, or physician assistant. (Id. at ¶ 7). Plaintiff declared an emergency later in the day on March 15, 2016, and was seen by a different nurse and given an ace wrap and ice pack. (Id. at ¶ 8). On June 8, 2016, Defendant Grindstaff ordered an EKG for Plaintiff during a non-patient contact encounter. (Id. at ¶ 9). On October 10, 2016, Defendant Grindstaff saw Plaintiff for chronic clinic as a routine check-up for blood pressure and cholesterol issues. (Id. at ¶ 10). Defendant Grindstaff ordered lab testing and blood pressure checks for a period of two weeks, and scheduled his next chronic disease nurse check-up for six months, all pursuant to DPS policy. (Id.). This encounter was reviewed and co-signed by the facility physician. (Id.). On November 30, 2016, Defendant Grindstaff saw Plaintiff for a sick call. (Id. at ¶ 11). During this visit, since Plaintiff was already on the Ibuprofen and Acetaminophen protocol that nurses can issue, Defendant Grindstaff scheduled Plaintiff to be seen by the medical provider. (Id.).

Neither Defendant Melton nor Defendant Grindstaff are aware of any instances that Plaintiff did not receive a response to a sick call request. (Ex. 1 at 15). UR requests are requested by providers (i.e. physician, nurse practitioner, physician assistant); thus, neither Defendant Melton nor Grindstaff requested UR. (Ex. at 16; Melton Aff. at ¶ 14; Grindstaff Aff.

10

at ¶ 20). Whether and when a particular medical intervention, such as a surgery, is requested, ordered, or approved is outside of the scope of practice for Defendants Melton and Grindstaff. (Ex. 1 at 16; Melton Aff. at ¶ 15; Grindstaff Aff. at ¶ 21). Instead, such medical interventions are requested, ordered, and approved by providers (i.e. physician, nurse practitioner, physician assistant). (Id.). Moreover, nursing staff such as Defendants Melton and Grindstaff refer a patient to a provider for any concerns/complaints that cannot be treated within their nursing scope of practice. (Ex. 1 at 16; Melton Aff. at ¶ 16; Grindstaff Aff. at ¶ 22). From there, whether a patient, including Plaintiff, is referred for outside medical treatment is up to the provider and controlled by the UR process. (Ex. 1 at 16-17; Melton Aff. at ¶ 16; Grindstaff Aff. at ¶ 22).

Nursing staff such as Defendants Melton and Grindstaff have limited involvement in the referral or receipt of orthopedic shoes. (Ex. 1 at 18; Melton Aff. at ¶ 18; Grindstaff Aff. at ¶ 15). A nurse will see a patient who is requesting shoes for a sick call. (Id.). If the patient meets the basic criteria for shoes, then the nurse schedules the patient to see a provider. (Id.). If the provider agrees that the patient might benefit/qualify for shoes, then the provider requests approval for an orthotic consult, through the UR process. (Id.). Assuming the request is approved, the patient attends the consult, the shoes are ordered, then the shoes are mailed to the facility or the patient is scheduled to go back to the clinic to pick them up. (Id.). Neither Defendant Melton nor Grindstaff have any recollection of being involved in Plaintiff's referral for and receipt of orthopedic shoes. (Id.).

Nursing staff such as Defendants Melton and Grindstaff can provide people with wheelchairs for a two-week period for acute issues, until that person is seen by the provider, without an order. (Ex. 1 at 19; Melton Aff. at ¶ 19; Grindstaff Aff. at ¶ 16). Otherwise, nursing

11

staff's involvement in the procurement of a wheelchair would be limited. (Id.). A nurse will see a patient who is requesting a wheelchair during a sick call, then the nurse would schedule the patient to see a provider. (Id.). Neither Defendant Melton nor Grindstaff have any recollection of being involved in Plaintiff's referral for and receipt of a wheelchair. (Id.).

When an offender transfers to another facility, their medications are packaged and sent out on bus mail. However, there was a delay in the medication transfer which resulted in Plaintiff's medication not arriving at Franklin Correctional until he returned to Mountain View. (Melton Aff. at ¶ 11). There was an issue with Plaintiff's boots, which needed to be exchanged for a color that complied with policy. (Id. at ¶ 12). Contrary to Plaintiff's allegations, he was offered a smaller wheelchair but refused the same. (Id. at ¶ 13).

### iii.    Dr. Uhren's Summary Judgment Evidence

In support of his own summary judgment, Defendant Dr. Uhren has submitted a sworn affidavit, providing in detail his medical care of Plaintiff from 2011 onward.[1] Dr. Uhren has also attached numerous medical records relating to Plaintiff's treatment while at Mountain View. On July 15, 2011, Dr. Uhren reviewed Plaintiff's chart and ordered that Plaintiff be scheduled for an appointment to discuss his chronic pain management and asked that a nurse inform him of Plaintiff's remaining Vicodin doses so that he could ensure they lasted for the four-week period as prescribed. On July 22, 2011, Dr. Uhren assessed Plaintiff, who informed Dr. Uhren that his chronic pain was related to an old injury that occurred before incarceration and had been treated in a pain clinic with Percocet. Dr. Uhren reviewed Plaintiff's x-rays, which were negative for

---

[1] Because Court finds that the statute of limitations began to run in 2015, this earlier treatment is not determinative to Plaintiff's deliberate indifference claim, but it is being cited to demonstrate that, contrary to Plaintiff's allegations, Defendant responded appropriately and consistently to Plaintiff's medical complaints.

any secondary disease, indicating that his pain complaints were from his original injury and Dr. Uhren informed Plaintiff of the same.

Dr. Uhren states in his affidavit that, contrary to Plaintiff's allegations, Dr. Uhren did not inform Plaintiff that there was nothing wrong with his back; rather, he told him that the x-rays did not show any abnormality. As two UR Requests for Neurontin had previously been denied, Dr. Uhren prescribed Norco to manage Plaintiff's pain. Dr. Uhren reviewed Plaintiff's chart and saw that he had recently been assessed and that activity restrictions had been put in place in June 2011. (Uhren Aff. at ¶ 106).

Plaintiff was seen by other providers until his chart was referred to Dr. Uhren on October 7, 2011, for consideration of narcotic renewal. As no sick call appointment request had been submitted requesting a renewal of medication, Dr. Uhren advised that Plaintiff be informed to submit a sick call request. However, based on Plaintiff's refusal to consider alternative modalities to treat his pain, and the nurse practitioner's suspicion that Plaintiff was drug-seeking, Dr. Uhren indicated that a renewal of Norco was not likely. Plaintiff subsequently submitted a sick call appointment request for gel insoles and Neurontin, which was referred to Dr. Uhren on October 28, 2011, and Dr. Uhren ordered gel insoles for Plaintiff to help manage his sciatica. Dr. Uhren reviewed Plaintiff's chart and did not observe any change in his condition that was likely to result in UR approval of a third submission for Neurontin and requested that Plaintiff be advised of the same. Dr. Uhren also ordered that Plaintiff be scheduled for a clinical appointment so that Dr. Uhren could personally assess him for any change in his condition. (Id.).

On November 4, 2011, Dr. Uhren assessed Plaintiff and performed a physical examination. Although there was no change in his condition, Dr. Uhren's plan was to try and have Neurontin approved for Plaintiff's sciatica, and Dr. Uhren ordered that a UR Request be

submitted for the same. Dr. Uhren ordered Neurontin 300mg three times a day for three months, and while waiting for the Neurontin to be approved, Dr. Uhren ordered that Plaintiff take two tablets of Tylenol Arthritis three times a day for six months, in addition to his other pain medications, to manage and treat his back pain. (Id.).

On December 16, 2011, Dr. Uhren was notified that the UR Request for Neurontin had been denied. As a result, Dr. Uhren ordered a renewal of Plaintiff's Tegretol and increased the dose to 200 mg twice a day for three months to manage and treat Plaintiff's pain complaints. Dr. Uhren also requested that Plaintiff be scheduled for an appointment with Dr. Uhren so that they could discuss his pain management in light of the UR Request denial and to see if the Tegretol was controlling Plaintiff's pain. (Id.).

On December 30, 2011, Dr. Uhren saw Plaintiff to discuss his pain management. Plaintiff informed Dr. Uhren that the increased dose of Tegretol had helped manage his pain. Dr. Uhren discussed the UR reviewer's denial of Neurontin and recommendation that Nortriptyline be prescribed, and Plaintiff indicated that he could not take Nortriptyline because it caused his heart to flutter. Dr. Uhren performed a physical examination of Plaintiff and nothing had changed since his last examination. Dr. Uhren assessed Plaintiff with chronic low back pain with radiculopathy. As Plaintiff had tried various medications to manage his pain (NSAID, Tylenol Arthritis, Norco, and Tegretol), which had not been effective or as effective as preferred, and the fact that Plaintiff experienced side-effects from Elavil and Nortriptyline, Dr. Uhren ordered the resubmission of a UR Request for Neurontin since Nortriptyline was not a viable option based on Plaintiff's reported side-effects. The corresponding UR Request was submitted on January 3, 2012. On January 27, 2012 and again on February 3, 2012, Dr. Uhren reviewed Plaintiff's chart to determine the status of the UR request for Neurontin. Per the UR reviewer,

14

when Nortriptyline had previously been prescribed for Plaintiff in 2011, he returned all but one dose of the tablets prescribed for a three-month period of time to the pharmacy and alleged that his heart was fluttering. One dose was an insufficient trial to determine if Nortriptyline was effective and whether it was the etiology of Plaintiff's heart flutter. As a result, Dr. Uhren withdrew the UR request for Neurontin so that a trial of Nortriptyline could be implemented. Dr. Uhren instructed the nursing staff to inform Plaintiff that Dr. Uhren could not receive Neurontin without first trying Nortriptyline per the UR reviewer's previous indication, and Plaintiff was informed of the same on February 15, 2012.

Plaintiff was finally approved for Neurontin on December 26, 2012, and it was prescribed by another provider on January 8, 2013. (Id.). After Dr. Uhren's review of Plaintiff's chart on February 3, 2012, upon information and belief, Plaintiff was re-assigned to be seen by other health care providers at Mountain View. Upon information and belief, Dr. Uhren was no longer Plaintiff's primary care provider. Dr. Uhren would still review Plaintiff's chart for routine medication renewal orders and other chart review matters that were referred to him, but Plaintiff's primary care was provided by other health care providers from February 3, 2012 through November 2013.

Dr. Uhren's care of Plaintiff was limited. As an example, Plaintiff's chart was referred to Dr. Uhren on March 16, 2012, for the purpose of entering a medication renewal order for Tegretol. Dr. Uhren ordered that Plaintiff should continue taking Tegretol 200 mg twice a day for six months. On or about August 24, 2012, Plaintiff's chart was referred to Dr. Uhren for consideration of renewal of Tylenol Arthritis, and Dr. Uhren entered an order for him to receive Tylenol Arthritis three times a day as needed for six months. On June 7, 2013, Dr. Uhren conducted a review of Plaintiff's chart for the purpose of addressing a medical need unrelated to

15

the subject matter of this lawsuit. However, Dr. Uhren noted that a recent UR Request for Neurontin had been withdrawn on May 21, 2013, as Plaintiff already had approval for the medication through December 26, 2013. As such, Dr. Uhren entered an order for Plaintiff to begin receiving 600 mg of Neurontin three times a day until December 26, 2013. On June 25, 2013, upon information and belief, a nurse contacted Dr. Uhren via telephone to clarify the correct dose for Plaintiff's order for Neurontin. Dr. Uhren informed the nurse that Plaintiff was to take 600 mg of Neurontin three times a day until December 26, 2013. On October 8, 2013, Dr. Uhren conducted a review of Plaintiff's chart in connection with the nurse's referral from the September 14, 2013, sick call appointment. Based on Dr. Uhren's review, Dr. Uhren entered an order for Plaintiff to be scheduled for an appointment to discuss his request for an increased dose of Neurontin. (Id.).

On November 14, 2013, Dr. Uhren conducted a review of Plaintiff's chart and entered orders for him to take two tablets of Tylenol Arthritis and 800 mg of Ibuprofen three times a day for three months, in addition to the Neurontin for pain. Dr. Uhren also ordered an antinuclear antibodies panel and a rheumatoid arthritis factor test to rule out possible underlying causes of Plaintiff's reported pain. Dr. Uhren ordered that Plaintiff be scheduled for an in-person follow-up assessment in four to six weeks so that Dr. Uhren could determine the effectiveness of Plaintiff's new pain medication regimen.

On December 6, 2013, Dr. Uhren reviewed the results of the antinuclear antibodies panel and rheumatoid arthritis factor test, which were within normal limits. On December 18, 2013, when Plaintiff was subsequently assessed as to the effectiveness of his pain medication, a nurse observed that Plaintiff moved fairly well and that he was able to bend down and pulled out the step on the exam table well, which was not consistent with Plaintiff's reported pain complaints.

16

She did not believe, based on her in-person objective assessment, that Plaintiff's Neurontin dose should be increased. Dr. Uhren agreed with Ms. Hill's assessment and that her objective findings were inconsistent with Plaintiff's reported pain complaints and in Dr. Uhren's medical judgment it was not appropriate to increase the Neurontin dose. Based on the pain medications already prescribed and the objective observation of Plaintiff's movement, the medications were appropriately managing Plaintiff's pain. (Id.).

On January 24, 2014, Dr. Uhren reviewed Plaintiff's chart in connection with a nurse's referral from a January 15, 2014, sick call appointment. Based on his review, Dr. Uhren entered a renewal order for Plaintiff to take 600 mg of Neurontin three times a day for six months to manage his chronic back pain. Dr. Uhren completed a Consultation/Referral Form that day and the corresponding UR Request was submitted on January 27, 2014, which was subsequently approved on January 30, 2014. During the January 15, 2014, sick call appointment with a nurse, Plaintiff claimed that he had been without Neurontin for a month.

NCDPS's policy pertaining to the inmate medication refill system states that an Inmate Medication Refill Request form or Sick Call Appointment Request is required to be submitted ten days before the refill is due. All inmates are educated as to the process by which medications should be requested to be refilled, and it is the inmate's responsibility to ensure that a refill its timely requested so that it can be refilled prior to its expiration. Inmate medication refill request forms are not made a part of the inmate's medical record and, therefore, such a request would not have been seen by a provider upon any review of Plaintiff's chart. Defendant Uhren contends that, upon information and belief, Plaintiff did not submit an inmate medication refill request form or a sick Call Appointment Request to request a refill of Neurontin and, therefore, it expired. Dr. Uhren asserts that, contrary to the allegations contained in the Complaint, he did not

17

"allow" the Neurontin prescription to expire; rather, it was never submitted to him to refill per NCDPS policy. Had it been submitted to Dr. Uhren prior to its expiration, he would have refilled it, just as he did on January 24, 2014. However, no request was provided to Dr. Uhren for a refill of Plaintiff's Neurontin before its expiration. On March 7, 2014, Dr. Uhren conducted a routine review of Plaintiff's chart for medication renewal and revised his order for Neurontin, extending the period of time Plaintiff was to take it from six months to one year. (Id.).

On July 22, 2014, Dr. Uhren examined Plaintiff, upon information and belief, in connection with a referral from a physician assistant for consideration of an increase in Plaintiff's Neurontin dose. Plaintiff informed Dr. Uhren that Ibuprofen and Tylenol did not effectively manage his pain and that Tegretol also was not effective. Plaintiff did report that Neurontin was effective but did not last very long. He claimed that he was unable to take Elavil for pain as he experienced side effects. Dr. Uhren examined Plaintiff and observed no changes in his condition since his last physical examination. Dr. Uhren assessed Plaintiff with lower back pain and decided to enter a UR request for an orthopedic consultation for evaluation of his continued pain. Dr. Uhren completed a Consultation/Referral Form for the orthopedic consultation that day and the corresponding UR Request was submitted on July 24, 2014.

On August 27, 2014, a UR reviewer recommended that a trial of up to four weeks of physical therapy be ordered first, before approval of an orthopedic consultation. The UR request was converted into a request for physical therapy on September 11, 2014. On September 12, 2014, Dr. Uhren retroactively completed a Consultation/Referral form and entered an order in Plaintiff's chart regarding the conversion from an orthopedic consultation to a physical therapy evaluation. Between September 18, 2014, and December 16, 2014, Plaintiff underwent physical therapy. Plaintiff reported decreased pain after his physical therapy treatments, and on

18

December 18, 2014, was discharged from physical therapy as he had reached his potential. (Id.).

Regarding Plaintiff's allegations regarding his hernia, on November 25, 2014, Plaintiff was seen by a nurse in response to a November 24, 2014, sick call appointment request in which he complained of a hernia and swelling of his left testicle. This was the first time Plaintiff had reported such complaints. The nurse examined him and observed that he had a palpable 3 x 2 inch bulge in his left groin/inguinal area that was moveable with gentle manipulation. The nurse referred Plaintiff to a provider for further evaluation.

The next day, on November 26, 2014, Plaintiff was evaluated by Dr. Kalinski, who observed that Plaintiff had a 6 x 5 centimeter (3 x 2 inch) mass in his abdominal wall, with signs of a subcutaneous hematoma. There was also swelling and tenderness to Plaintiff's scrotum. Dr. Kalinski assessed Plaintiff with a left inguinal hernia and an internal hemorrhage with a subcutaneous hematoma. Dr. Kalinski informed Plaintiff that he would be referred for a surgical consultation and that, in the meantime, he was to avoid strenuous exercise that increased intra-abdominal pressure. An order was entered for Plaintiff to wear a jockstrap for six months to help support his abdominal wall. A Consultation/Referral form for a surgical consultation was completed that day. The corresponding UR Request was submitted on December 4, 2014, which was subsequently approved on January 7, 2015.

Contrary to the allegations contained in Plaintiff's Complaint, Plaintiff's hernia complaints were assessed by a physician and a surgical consultation was placed for further assessment the first time those complaints were raised; no delay occurred. On January 13, 2015, Plaintiff was seen by Dr. Patel for a surgical consultation, who recommended Plaintiff undergo inguinal hernia repair surgery. On January 15, 2015, based on Dr. Patel's recommendation, a physician's assistant completed a Consultation/Referral form for Plaintiff to undergo inguinal

19

hernia repair surgery.  The corresponding UR request was submitted on January 16, 2015, which was subsequently approved on January 22, 2015.

Plaintiff underwent surgery on February 23, 2015, during which mesh was used to repair the hernia.  There is no evidence that the hernia "migrated."  Further, hernia mesh is routinely used and is the standard of care to repair a hole in the intestine where the intestine has bulged, thereby causing the hernia.  The mesh supports damaged tissue around the hernia as it heals and it is placed across the area surrounding the hernia.  Pores in the mesh allow tissue to grow into the mesh, and its use often leads to fewer recurrences.

The mesh is not "wire" as alleged in the Complaint, but is made of synthetic material, often polypropylene, a synthetic plastic.  Dr. Patel discharged Plaintiff from his care on March 24, 2015.  Per Dr. Patel's discharge note, Plaintiff was experiencing no symptoms and had healed.  Dr. Patel did not recommend any further treatment or restrictions and did not recommend that Plaintiff use a wheelchair.  Contrary to the allegations in the Complaint (Doc. No. 34 ¶ 17), Plaintiff was not "confined to a wheelchair" as result of the hernia or its repair. (Id.).

On April 17, 2015, Dr. Uhren examined Plaintiff for a follow-up appointment to evaluate his low back pain with radiating to the right leg and hip.  This was the first time that Dr. Uhren had evaluated Plaintiff in-person since submitting the orthopedic consultation request that was converted to an order for physical therapy in July 2014.  Plaintiff complained that he was unable to comfortably stand when he experienced back spasms.  Dr. Uhren observed that Plaintiff walked with a right-legged limp even with a cane.  Dr. Uhren performed a physical examination and Plaintiff's leg strength in his right leg was less than that of his left leg.  Based on his evaluation, Dr. Uhren assessed Plaintiff with low back pain with neuropathy and entered an order

20

for Plaintiff to take 800 mg of Ibuprofen three times a day as needed for three months. Dr. Uhren also completed Medical Notification Slips to allow Plaintiff the use of a cane and for handicap seating for a period of six months. Dr. Uhren also ordered the entry of a UR request for Plaintiff to receive an orthopedic consultation to address his low back pain. Dr. Uhren completed a Consultation/Referral form for the consultation and the corresponding UR request was submitted on April 20, 2015. The UR request was deferred by the UR reviewer on May 20, 2015, and approved on July 22, 2015. Plaintiff was scheduled for an appointment on August 18, 2015. Contrary to the allegations in the Complaint, Plaintiff was not "confined to a wheelchair" at this time. (Id.).

Dr. Uhren was not involved in Plaintiff's relevant care again until February 12, 2016, when Dr. Uhren conducted a review of Plaintiff's chart. He reviewed the notes from Plaintiff's February 10, 2016, neurology consultation at Regional Neurology and Spine. Based on Dr. Uhren's review of Plaintiff's chart, including the neurology consultation note, he entered the following orders: 1) two 600 mg tablets of Gabapentin three times a day for ninety days (dispense sixty tablets); 2) one tablet of Percocet every six hours as needed; 3) 750 mg of Robaxin four times (dispense sixty tablets) (paper prescription had been provided by NP Robinson); and 4) two 2 mg tablets of Decadron twice a day for two days, then one 2 mg tablet for two days, then half a 2 mg tablet for two days, then half a 2 mg tablet once a day for two days. Dr. Uhren noted that Plaintiff only had UR approval for Gabapentin until March 1, 2016, and, therefore, Dr. Uhren entered an order for a rush UR request to be submitted to approve Plaintiff for continued use of Gabapentin. Lastly, Dr. Uhren updated Plaintiff's activity restrictions to include the use of a wheelchair. (Id.).

Dr. Uhren asserts that on June 3, 2016, upon information and belief, a nurse contacted Dr.

21

Uhren for an order renewing oxycodone/APAP (also known as Percocet) for continued management of his pain. Dr. Uhren entered an order for Plaintiff to continue taking a 5-325 mg tablet of Percocet four times a day for thirty days. Between June 4, 2016, and January 9, 2017, although Plaintiff received medical care during this period of time which pertains to the health issues relevant to this lawsuit, neither Plaintiff nor his chart were referred to Dr. Uhren to address those issues and, therefore, Dr. Uhren did not render any care to Plaintiff during this period of time relating to the issues in this lawsuit. (Id.).

On January 10, 2017, Dr. Uhren examined Plaintiff upon information and belief in response to a sick call appointment referral. At that time, Plaintiff complained of lower back pain radiating into his right leg, a lack of feeling in the top of his leg, and tingling and pain from his hip to the bottom of his foot. He indicated that a combination of Neurontin, Baclofen (muscle relaxant), and Tramadol (opioid pain reliever) helped manage his symptoms, and Dr. Uhren noted that his pain medication regimen was controlling Plaintiff's pain fairly well. Upon examination, Dr. Uhren observed that Plaintiff's lumbar spine was tender, he had a guarded gait, and had full range of motion in his hips.

Dr. Uhren assessed Plaintiff with chronic pain and post-laminectomy syndrome (condition characterized by chronic pain following back surgery) and determined that a follow-up neurosurgery appointment was necessary and, therefore, Dr. Uhren ordered the entry of a UR request for the same. Dr. Uhren noted that Plaintiff continued to request medications, restrictions, and equipment renewals for which Plaintiff had not submitted sick call appointment requests. Per the NCDPS Sick Call appointment policy, as Plaintiff was only referred to Dr. Uhren for his follow-up back pain issues, Dr. Uhren was not able to address Plaintiff's additional complaints at that time. Dr. Uhren, therefore, educated Plaintiff on NCDPS's policy regarding

22

submitting a sick call appointment request and advised him to submit such a request so that his remaining complaints could be addressed.  (Id.).

On January 15, 2017, Dr. Uhren conducted a review of Plaintiff's chart in connection with a nurse's January 8, 2017 referral, in which it was requested that Dr. Uhren enter a renewal order for Gabapentin (Neurontin), as it was scheduled to expire on January 22, 2017.  After reviewing Plaintiff's chart, Dr. Uhren entered an order for Plaintiff to take 1200 mg of Gabapentin three times a day for 180 days to be taken under direct observation.  On January 22, 2017, Dr. Uhren conducted a review of Plaintiff's chart in connection with a nurse's referral from a response to a January 10, 2017, sick call appointment request, in which Plaintiff requested a renewal order for Tramadol.  Dr. Uhren reviewed Plaintiff's chart and entered an order for him to take 200 mg of Tramadol ER every day for three months.  (Id.).

On February 12, 2017, Dr. Uhren conducted a review of Plaintiff's chart for the purpose of reviewing the notes and recommendations from the February 10, 2017, neurosurgery consultation at Regional Neurology and Spine.  Based on the neurosurgery note, Dr. Uhren entered orders for the entry of UR requests to approve Plaintiff for a thoracic and lumbar MRI and for a follow-up neurosurgery consultation.  Dr. Uhren also updated Plaintiff's restrictions to include the use of an extra mattress.  As the remainder of the recommendations were already in place, there was no need for Dr. Uhren to take further action.  Upon information and belief, on January 27, 2017, Dr. Uhren was informed that a UR request needed to be submitted for Tramadol.  Therefore, Dr. Uhren entered an order for the submission of a UR request.  The corresponding UR request was submitted on January 30, 2017, and subsequently approved on February 9, 2017, with the request that Plaintiff undergo a random medication level test and renew his pain contract.  (Id.).

On February 21, 2017, Dr. Uhren was informed that per the UR reviewer, in order for Plaintiff to continue taking Tramadol, he needed to undergo a random medication level test (to determine whether he was medication compliant) and enter into a new pain contract. Dr. Uhren instructed nursing to have Plaintiff sign a pain contract for Tramadol and, upon information and belief, entered an order for lab work to check Plaintiff's Tramadol level. On March 7, 2017, Dr. Uhren reviewed the results of the Tramadol level test that he had ordered on February 21, 2017. Dr. Uhren noted that Plaintiff's Tramadol level was lower than the reference interval, indicative of non-compliance in taking that medication as prescribed.

Dr. Uhren entered an order to schedule Plaintiff for an appointment to discuss the findings of the Tramadol level test and to educate him on proper compliance consistent with the terms of the pain contract that he had signed. Upon information and belief, on March 14, 2017, Dr. Uhren discussed with Plaintiff the results of the recent Tramadol level test. Dr. Uhren informed Plaintiff that his Tramadol level was low, which indicated that he was either missing doses or diverting the doses or Tramadol. Plaintiff swore that he had not missed a dose nor was he diverting any of his Tramadol. Dr. Uhren educated Plaintiff as to the terms of the pain contract and then Dr. Uhren decided to allow Plaintiff to continue taking Tramadol. However, Dr. Uhren entered an order for Plaintiff's Tramadol level to be rechecked by May 18, 2017. Dr. Uhren also entered an order for Plaintiff to continue taking 650 mg of Acetaminophen every eight hours as needed for 180 days for pain, and to discontinue the use of Ibuprofen. (Uhren Aff. ¶ 106).

On March 22, 2017, Dr. Uhren conducted a review of Plaintiff's chart, which included the review of the results of March 15, 2017, MRIs of Plaintiff's thoracic and lumbar spine. Based on his review of the MRI reports, Dr. Uhren entered an order for the entry of a rush UR

24

request to approve Plaintiff for a follow up neurosurgery consultation, as Plaintiff's neurosurgeon had requested that he return for follow up after the MRIs had been completed. The corresponding UR request was submitted on March 23, 2017, which was subsequently approved on March 27, 2017. On April 20, 2017, Dr. Uhren conducted a review of Plaintiff's chart for the purpose of reviewing the notes from his April 19, 2017, follow-up neurology consultation at Regional Neurology and Spine. According to those notes, NP Robinson reviewed the March 15, 2017, MRI reports, noting that there was no significant lumbar stenosis and that there was a small area of enhancement in the previous resection area likely secondary to a small resection bed. However, he noted that the possibility of a recurrent cystic lesion could not be ruled out.

NP Robinson discussed Plaintiff's pain management with him, which included continued use of Neurontin and Baclofen. NP Robinson also recommended a low dose of Tramadol for breakthrough pain. NP Robinson informed Plaintiff that his pain was likely decompressive neuralgia, which would have to heal over time, and NP Robinson advised him that it might take up to a year and a half to see significant relief. NP Robinson advised Plaintiff to continue to walk as much as tolerated and perform the stretches he learned while in physical therapy. NP Robinson recommended that Plaintiff continue activity and exercises as tolerated, continue taking Neurontin and Baclofen three times a day, and use a TENS unit on his lumbar and thoracic regions. NP Robinson also wrote Plaintiff orders for 100 mg of Tramadol once a day for sixty days and for 750 mg of Robaxin (muscle relaxant) four times a day for ten days.

Based on Dr. Uhren's review of NP Robinson's notes, Dr. Uhren entered an order for the entry of a rush UR Request to approve a TENS unit for Plaintiff. The UR request was submitted on April 21, 2017, which was subsequently approved on April 23, 2017. As Plaintiff was already taking Tramadol at a greater dose than recommended by N.P. Robinson and Dr. Uhren

25

believed that he was also taking Baclofen (a muscle relaxant), there was no reason for him to enter further orders. (Id.).

On May 7, 2017, Dr. Uhren reviewed Plaintiff's chart in response to a May 3, 2017, nurse's referral for a renewal order for Neurontin. Dr. Uhren noted that his UR approval of Gabapentin (also known as Neurontin) was to expire on May 23, 2017. Dr. Uhren determined that continued use of Neurontin was appropriate and, therefore, entered an order for Plaintiff to take 1200 mg of Gabapentin three times a day for 180 days. He also entered an order for the entry of a rush UR request for approval for Gabapentin. (Id.). On August 20, 2017, Dr. Uhren conducted a review of Plaintiff's chart in response to an August 9, 2017, nurse's referral. Dr. Uhren noted in the nurse's referral that Plaintiff requested to be allowed to go to the chow hall immediately after taking his 3:00 p.m. doses of Neurontin and Baclofen. He told that nurse that he sometimes became nauseous during the hour between when he took his medication and when he was allowed to eat. He also requested that he receive saltine crackers along with his 3:00 p.m. dose of Neurontin and Baclofen. In response to Plaintiff's requests, Dr. Uhren entered an order that Plaintiff was allowed to go to the chow hall after his 3:00 p.m. medicine pass. Dr. Uhren also ordered that he could have saltine crackers when he received his 3:00 p.m. medications. (Id.).

On January 12, 2018, Dr. Uhren conducted a review of Plaintiff's chart in connection with December 26, 2017, and January 8, 2018 nurses' referrals for renewal of Plaintiff's Gabapentin. Dr. Uhren reviewed Plaintiff's chart and noted that his UR approval of Gabapentin expired on January 8, 2018. Dr. Uhren determined that continued use of Gabapentin was appropriate and, therefore, entered an order for Plaintiff to take 1200 mg of Gabapentin three times a day for an additional 180 days. Dr. Uhren also entered an order for the entry of a rush

26

UR request for approval for Gabapentin. A rush UR request is the most expedient UR request that can be submitted. (Id.).

On May 7, 2018, Dr. Uhren conducted a review of Plaintiff's chart in connection with a May 7, 2018, nurse's referral for renewal of Plaintiff's Baclofen. Dr. Uhren reviewed Plaintiff's chart and noted that his UR approval of Baclofen was to expire on May 17, 2018. Dr. Uhren determined that continued use of Baclofen was appropriate and, therefore, entered an order for Plaintiff to take one 10 mg tablet of Baclofen three times a day under direct observation for 180 days. Dr. Uhren also entered an order for the entry of a rush UR request for approval for Baclofen. (Id.).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the

27

non-movant's position is insufficient to withstand the summary judgment motion.  Anderson, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.  Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.  Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of his claim.

## III.    DISCUSSION

The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual" punishment and applies to the states through the Fourteenth Amendment.  U.S. Const. amend. VIII; e.g., Estelle v. Gamble, 429 U.S. 97, 101 (1976).  The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement, such as adequate food, clothing, shelter, and medical care.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "The Supreme Court has prescribed a two-part inquiry to determine whether prison officials' conduct violated their duty under the Eighth Amendment to provide humane conditions of confinement."

28

Williams v. Branker, 462 F. App'x 348, 353 (4th Cir. 2012). "The first part of the inquiry asks whether the conditions of confinement inflict harm that is, objectively, sufficiently serious to deprive a prisoner of minimal civilized necessities." Id. (citing Farmer, 511 U.S. at 834). To be "sufficiently serious," the deprivation must be "extreme" in that it poses "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from […] exposure to the challenged conditions." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

"The second part of inquiry asks whether prison officials subjectively acted with 'deliberate indifference to inmate health or safety,' meaning that they actually knew of and disregarded the inhumane nature of the confinement." Id. To satisfy the "subjective" prong, a plaintiff must show that the defendant acted with a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834 (internal quotation and citations omitted). In conditions of confinement cases, the requisite state of mind is deliberate indifference. Id. In the Fourth Circuit, Farmer has been interpreted to require proof of two factors to successfully show deliberate indifference against a prison official: (1) that the prison official subjectively recognized a substantial risk of harm; and (2) that the official recognized that their actions were inappropriate in light of that risk. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004); Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "The subjective component [of the deliberate indifference standard] therefore sets a particularly high bar to recovery." Iko, 535 F.3d at 241. Thus, to constitute deliberate indifference "the treatment must be so grossly incompetent, inadequate, or excessive as to shock

29

the conscience or to be intolerable to fundamental fairness."  Miltier, 896 F.2d 848, 851 (4th Cir.

1990).  "Deliberate indifference is a very high standard—a showing of mere negligence will not

meet it."  Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Medical decisions, such as treatment choices, are beyond the scope of the Eighth

Amendment.  Graham v. Hurst, No. 13-C-3108-F, 2015 WL 670321, at *4 (E.D.N.C. Feb. 17,

2015) ("Likewise, disagreements over medications, diagnostic techniques, forms of treatment,

the need for specialists, and the timing of their intervention implicate medical judgment and not

the Eighth Amendment).  "Significantly, an 'error in judgment' on the part of prison medical

staff … will not constitute a constitutional deprivation redressable under § 1983."  Wynn v.

Mundo, 367 F. Supp. 2d 832, 837 (M.D.N.C. 2005), affirmed per curiam, 142 Fed. Appx. 193

(4th Cir. 2005) (unpublished) (citing Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979),

abrogated on other grounds by Neitzke v. Williams, 490 U.S. 319 (1989)).

Additionally, the doctrine of respondeat superior does not apply in constitutional tort

litigation—defendants can only be held liable for their own misconduct.  Ashcroft v. Iqbal, 556

U.S. 662, 676–77 (2009).  Therefore, to be liable under § 1983, a plaintiff must affirmatively

show that the subject official "acted personally in the deprivation of the plaintiff's rights."

Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).  Moreover, "[a] medical treatment claim

cannot be brought against non-medical personnel […] unless they were personally involved with

a denial of treatment or deliberately interfered with prison doctors' treatment."  Wynn v. Mundo,

367 F. Supp. 2d 832, 837 (M.D.N.C. 2004) (citing Miltier v. Beorn, 896 F.2d 848, 854–55 (4th

Cir. 1990)).

Supervisory liability under Section 1983 requires evidence of three elements.  Shaw v.

Stroud, 13 F.3d 791, 799 (4th Cir. 1994).  First, "actual or constructive knowledge of subordinate

30

conduct that poses a 'pervasive and unreasonable risk' of constitutional injury." Id. Proving "pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions[.]" Id. Second, "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices[.]'" Id. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses. Id. Third, "that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Id. "Causation is established when the plaintiff demonstrates an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff. Id.

### A. Plaintiff's Claims of Alleged Inadequate Medical Care Occurring Before March 13, 2015

Although there is no federal statute of limitations for actions brought under 42 U.S.C. § 1983, the state statute of limitations governing personal injury is applied to claims brought under Section 1983. Burnett v. Grattan, 468 U.S. 42, 49 (1984). In North Carolina, claims based on personal injury are governed by North Carolina General Statute § 1-52(5), which provides that a claim must be brought within three years on an action for "any other injury to the person or rights of another, not arising on contract and not hereafter enumerated." See also Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996). Therefore, the state statute of limitations for personal injury claims of three years is applicable to this Section 1983 lawsuit.

Whereas the limitations period is governed by state law, the accrual of a cause of action is governed by federal law. Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir. 1995). A cause of action under federal law begins to accrue "when the plaintiff possesses

31

sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Id. (citation omitted). The Supreme Court has held that the critical facts in determining time accrual are that a plaintiff knows he has been hurt and who inflicted the injury. United States v. Kubrick, 444 U.S. 111, 123 (1979).

The Court first finds that Plaintiff's claims of alleged inadequate medical care that occurred before March 13, 2015, are barred by the applicable three-year statute of limitations.[2] Plaintiff filed this action on June 21, 2018. (Doc. No. 1). This action was virtually identical to a similar action filed by Plaintiff, which was dismissed without prejudice by this Court on March 13, 2018. See (Civil No. 1:17cv104, Doc. No. 66). Although North Carolina recognizes the "continuing course of treatment" rule as an exception to the three-year statute of limitations, Plaintiff's factual allegations do not support the application of such doctrine here. The doctrine is applicable "so long as the patient has remained under the continuous treatment of the physician for the injuries which gave rise to the cause of action." Conner v. St. Luke's Hosp., Inc., 996 F.2d 651, 653 (4th Cir. 1993) (quoting Stallings v. Gunter, 99 N.C. App. 710, 714 (1990)). Therefore, to benefit from the "continuing course of treatment" rule, the plaintiff must "show the existence of a continuing relationship with his physician, and… that he received subsequent treatment from that physician." Id. at 654. Plaintiff's Complaint simply does not allege a continuing course of treatment for back pain and/or pain management from 2011 to the

---

[2] Unlike the Department Defendants, Dr. Urhen argues that ~~the statute of limitations bar was~~the cut-off date for time-barred claims is June 21~~21~~, 2015. Dr. Uhren argues that this Court's dismissal of Plaintiff's first action did not serve to toll the statute of limitations until Plaintiff filed this action on June 21~~15~~, 2018. Regardless of whether the statute of limitations began to run on March 13, 2015, or June 21~~15~~, 2015, for the claims Plaintiff brings here, Defendants are still entitled to summary judgment because Plaintiff has failed to raise a genuine issue of material dispute as to whether any of the named Defendants was deliberately indifferent to Plaintiff's serious medical needs.

32

filing of the Complaint. Assuming, arguendo, that the dismissal of Plaintiff's first action tolled the statute of limitations, any of Plaintiff's claims that rest on Defendants' alleged failure to provide certain medical services before March 13, 2015, are time-barred.

**B. Plaintiff's Claim Against Defendants in their Official Capacities**

Next, to the extent that Plaintiff has sued Defendants in their official capacities, a suit against a state official in his official capacity is construed as against the state itself. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). It is well settled that neither a state nor its officials acting in their official capacities are "persons" subject to suit under 42 U.S.C. § 1983. Id.; see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 n.55 (1978).

Moreover, the Eleventh Amendment generally bars lawsuits by citizens against non-consenting states brought either in state or federal courts. See Alden v. Maine, 527 U.S. 706, 712-13 (1999); Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 54 (1996). Although Congress may abrogate the states' sovereign immunity, it has not chosen to do so for claims under 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332, 343 (1979). North Carolina has not waived its sovereign immunity by consenting to be sued in federal court for claims brought under 42 U.S.C. § 1983. See generally Mary's House, Inc. v. North Carolina, 976 F. Supp. 2d 691, 697 (M.D.N.C. 2013) (claim under 42 U.S.C. § 1983 barred by sovereign immunity of North Carolina which had not been waived). Accordingly, Defendants are entitled to summary judgment as to Plaintiff's claims against them in their official capacities.

**C.    Plaintiff's Claim Against Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford in their Individual Capacities**

Plaintiff alleges that the Department Defendants were deliberately indifferent to his

33

medical needs.  However, Plaintiff has not raised a genuine issue of dispute on summary judgment as to whether these Defendants were deliberately indifferent to Plaintiff's serious medical needs.  First, Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford were not involved in, and thus did not deny or delay, the delivery of medical care.  Specifically, given the executive roles of Defendants Perry, Smith, and Solomon, none of them had any personal knowledge of Plaintiff's specific subjective experience or direct involvement in the provision of medical care to Plaintiff.  (Ex. 1 at 8).  Additionally, Defendants Perry and Solomon were not involved in the UR process, and Defendant Smith does not recall being involved in the same relative to Plaintiff.  (Id. at 9).

Defendants Crawford, Gibbs, and Slagle were not personally involved in any of Plaintiff's particular transfers or medical visits.  (Id. at 11).  Nor did they have a direct role in the provision of medical care to patients, including Plaintiff.  (Id.).  Instead, Defendants Crawford, Gibbs, and Slagle served as administrators with oversight responsibility for operations within the facility.  (Id.).  This record evidence demonstrates that Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford were not personally involved in any of the medical decision-making which forms the basis of Plaintiff's action.  Thus, Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford cannot be liable under Section 1983 for deliberate indifference to a serious medical need.  See Wright, 766 F.2d at 850.  Accordingly, Plaintiff cannot and has not presented any evidence that Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford were actually aware of any serious medical need and the attendant risks thereof.  Nor can Plaintiff demonstrate that despite this knowledge, Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford nonetheless consciously ignored such risks.

To the extent that Plaintiff purports to impose supervisory liability against any of these

Defendants, this theory of liability also fails. Supervisory liability under Section 1983 requires evidence of (1) actual or constructive knowledge of subordinate conduct that poses "a pervasive and unreasonable risk" of constitutional injury; (2) in light of this knowledge, that the supervisor's response was so inadequate as to show "deliberate indifference to or tacit authorization" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the injury. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Plaintiff's unsupported assertions are woefully insufficient to support the requisite elements of a supervisory liability claim. As explained above, Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford were not involved in any decisions related to whether, when, or what care was provided to Plaintiff, nor did they supervise the clinical work of medical providers, such as Defendants Melton and Grindstaff, or contract physicians, like Defendant Uhren. (Ex. 1 at 8, 11). It is true that Defendant Melton reports to Defendant Crawford. (Id. at 11). However, Defendant Melton, as the nurse supervisor, is the designated healthcare authority and, as such, ensures the well-being of the population and at Mountain View. (Id.). Thus, this reporting set-up alone does not establish the type of supervisor-subordinate relationship necessary to support a supervisory liability claim under Section 1983. Is sum, Plaintiff has not presented any evidence upon which a reasonable jury could return a verdict in his favor on his deliberate indifference claim against Defendants Solomon, Perry, Smith, Slagle, Gibbs, and Crawford. Therefore, there are no genuine issues as to any material fact and the Department Defendants are entitled to judgment as a matter of law.

**D. Plaintiff's Claim Against Defendants Melton and Grindstaff in their Individual Capacities**

Next, Plaintiff's sparse allegations against Defendants Melton and Grindstaff, even if

35

true, are wholly insufficient to support a deliberate indifference claim as to them.[3]  Plaintiff alleges that Defendant Melton's response to a grievance about a medication issue "defied logic[,]" that she did not send his medical boots to him, and that she did not provide him with a smaller wheelchair.  (Doc. No. 1 at ¶¶ 104–06, 148, 151–54).  Plaintiff alleges that Defendant Grindstaff and another nurse told him that a physician's assistant would see him the following week, that she rescheduled an appointment of his, and that when seeing him for complaints of pain in his back and legs, she did not take his blood pressure.  (Id. at ¶¶ 68, 72, 155).  These allegations either lack merit, are unsupported by the record evidence, or are insufficient, as a matter of law, to support a deliberate indifference claim.

To overcome summary judgment, Plaintiff must present evidence sufficient to raise a genuine factual and material dispute as to whether Defendants Melton and Grindstaff actually knew of a serious risk of harm and nonetheless chose to disregard the risk.  Plaintiff presents no such evidence; indeed, Plaintiff has presented no evidence whatsoever to rebut Defendants' summary judgment evidence.  Defendant Melton's affidavit recalls her involvement in the events alleged by Plaintiff, none of which concern matters that could reasonably considered serious medical needs.  Nonetheless, the record evidence demonstrates that Defendant Melton's actions were responsive to Plaintiff's concerns.  Plaintiff's medication was delayed to a bus scheduling issue, boots had to be exchanged for a pair that complied with policy, and he was offered, but refused a wheelchair.  (Melton Aff. at ¶¶ 11–13).  Such events simply cannot support a finding of a conscious disregard to Plaintiff's health and safety.

---

[3]  To the extent that Plaintiff makes various blanket assertions in the Complaint of inadequate care or negligence of "medical staff" and "medical professionals" at Mountain View, without a reference to any specific conduct by Defendants Melton and Grindstaff, none of these generalized allegations can result in any liability of Defendants Melton and Grindstaff.

36

Defendant Grindstaff recalls seeing Plaintiff several times following sick call requests and is not aware of any instance when such a request was not responded to by staff. (Ex. 1 at 15). Defendant Grindstaff would have become aware of Plaintiff's reported subjective pain experience during each clinical encounter, in which she took part. (Id. at 17). Based on Plaintiff's presentation, Defendant Grindstaff would have treated Plaintiff in accordance with established nursing protocols or scheduled him to be evaluated by a provider. (Id. at 17–18). Defendant Grindstaff's affidavit recounts several specific clinic encounters and her involvement therein. (Grindstaff Aff. at ¶¶ 6-11). On this evidence, Plaintiff simply has not shown that Defendant Grindstaff was aware of and consciously disregarded a serious risk to his health and safety, and thus cannot establish the subjective component of his deliberate indifference claim.

Finally, to the extent that Plaintiff's deliberate indifference claim rests on the notions that he should have been provided different or better care, such a claim fails as a matter of law. Claims related to the denial of a smaller wheelchair, whether he should have received an orderly, or that he should have seen a physician rather than a nurse, or that the nursing staff should have performed certain clinical assessments, are essentially disagreements between him and his providers over the course of his treatment, which are not sufficient to support a deliberate indifference claim. Banks v. Gore, 738 F. App'x 766, 771 (4th Cir. 2018). In sum, Plaintiff has presented no credible evidence upon which a reasonable jury could return a verdict in his favor on his deliberate indifference claim against Defendants Melton and Grindstaff. Defendants Melton and Grindstaff are entitled to judgment as a matter of law.

### E. Plaintiff's Claim Against Dr. Uhren in his Individual Capacity

As with the other Defendants, Plaintiff has not produced evidence raising a genuine factual material dispute as to whether Dr. Uhren was deliberately indifferent to any of his

37

medical needs. As Plaintiff's medical records and Dr. Uhren's affidavit show, Dr. Uhren never disregarded the symptoms and/or concerns with which Plaintiff presented. Dr. Uhren made decisions and treatment recommendations, took appropriate action, and made professional medical decisions based on Plaintiff's complaints, and never acted for the purpose of causing Plaintiff harm. Based on Plaintiff's symptoms, Dr. Uhren's review of his chart, and Dr. Uhren's personal examinations of Plaintiff, Dr. Uhren did not believe that treatment and/or medications other than those prescribed to Plaintiff were medically necessary. During his treatment of Plaintiff, Dr. Uhren conducted chart reviews and physical examinations, ordered and renewed Plaintiff's prescriptions, and ordered and reviewed diagnostic tests and other treatment modalities when Plaintiff's various medical conditions required it, and referred Plaintiff to appropriate specialists when necessary. Dr. Uhren also received and reviewed the recommendations of other health care providers, including consulting neurologists to whom Plaintiff was referred for care. (Uhren Aff. ¶ 106).

Between July 12, 2011 and June 21, 2018, Dr. Uhren personally examined Plaintiff on at least five occasions and performed chart reviews of Plaintiff's medical records and/or test results on at least twenty-one occasions. Dr. Uhren also ordered the submission of at least eleven UR requests for Plaintiff. Plaintiff was seen by various other health care providers, including physician assistants, nurses, orthopedist, physical therapists, and a neurologist. (Id.). On summary judgment, Dr. Uhren has presented evidence showing that at no time did he disregard the symptoms and/or concerns with which Plaintiff presented. To the contrary, he took appropriate action and made professional decisions and treatment recommendations or referrals based on Plaintiff's complaints. Dr. Uhren did not ignore Plaintiff's medical needs or deny him any necessary treatment for any alleged medical condition.

38

Furthermore, Dr. Uhren's actions were justified and were not committed with the "sufficiently culpable state of mind" required for Section 1983 liability.  See Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998).  Plaintiff offers no evidence that Dr. Uhren was subjectively aware of any need to take additional measures for his complaints.  Under Farmer, Dr. Uhren cannot be liable unless he knew of and disregarded an excessive risk to Plaintiff's health or safety.  Here, no excessive risk to Plaintiff's health or safety ever existed because Dr. Uhren addressed every medical need of Plaintiff and recommended care based on his medical experience and judgment.  Plaintiff has produced no evidence that Dr. Uhren ignored any of his medical complaints.  To the contrary, the evidence demonstrates that Dr. Uhren treated Plaintiff every time he showed up for treatment.  In sum, Plaintiff has failed to raise a genuine dispute of material fact as to whether Dr. Uhren was deliberately indifferent to Plaintiff's serious medical needs.  Thus, Dr. Uhren is entitled to summary judgment in his favor.

IV.     **CONCLUSION**

Plaintiff has failed to raise a genuine issue of material fact as to whether Defendants may be held liable for deliberate indifference to Plaintiff's serious medical needs, and Defendants are therefore entitled to summary judgment as to Plaintiff's Eighth Amendment claim.[4]

**IT IS, THEREFORE, ORDERED** that:

1.  Defendants' Motions for Summary Judgment, (Doc. No. 56, 69), are both

    **GRANTED**, and this matter is dismissed with prejudice.

2.   The Clerk is respectfully instructed to terminate this action.

_____

[4] Defendants also raised qualified immunity as a defense to Plaintiff's Eighth Amendment deliberate indifference claim.  Because the Court has determined that there was no constitutional violation in the first instance, the Court does not need to determine whether Defendants are entitled to qualified immunity.

39

Signed: April 8, 2021

Max O. Cogburn Jr.
United States District Judge

40